[Cite as *J.D. v. State*, 2019-Ohio-4446.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| J.D., et al. | | C.A. No.    29234 |
| Appellants | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| STATE OF OHIO | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellee | | CASE No.    CV-2015-04-2351 |

DECISION AND JOURNAL ENTRY

Dated: October 30, 2019

CALLAHAN, Judge.

{¶1}    Appellants, J.D. and M.M., appeal a judgment of the Summit County Court of Common Pleas that determined that they were not wrongly imprisoned individuals. This Court affirms.

I.

{¶2}    In the early hours of October 28, 2012, members of the Akron Police Department arrested several individuals at a residence that was suspected to be the location of a methamphetamine lab. J.D. and M.M. were among those arrested. They were charged with illegal manufacture of drugs in violation of R.C. 2925.04(A) and illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A). A jury found J.D. and M.M. guilty of both charges. J.D. was sentenced to three years in prison; M.M., who had a prior drug-related conviction, was sentenced to five years in prison. J.D. and M.M. appealed,

and in 2014, this Court reversed their convictions, concluding that in each of their cases, the convictions were not supported by sufficient evidence.

{¶3}    In 2015, J.D. and M.M. filed a petition that requested declarations that they were wrongfully imprisoned individuals under R.C. 2743.48.    The State moved for summary judgment, but the trial court concluded that there were genuine issues of material fact regarding whether J.D. and M.M. had established that they were actually innocent of the charges brought against them, as required by R.C. 2743.48(A)(5), and denied the motion.    Following a bench trial, the trial court entered judgment in favor of the State, concluding that J.D. and M.M. were not wrongfully imprisoned individuals because they did not carry their burden of proving that they were actually innocent of the charges.    J.D. and M.M. filed this appeal.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE[.]

{¶4}    In their only assignment of error, J.D. and M.M. argue that the trial court's conclusion that they did not prove their actual innocence is against the manifest weight of the evidence.    This Court disagrees.

{¶5}    When the weight of the evidence is challenged in a civil case, this Court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'"  (Alterations in original.)  *Eastley v. Volkman*, 132 Ohio St. 3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).  *See also Palmer v.*

*State*, 9th Dist. Medina No. 2878-M, 1999 WL 820758, *2 (Oct. 13, 1999) (applying this standard to an actual innocence determination under R.C. 2743.48(A)).

**{¶6}** "All wrongful-imprisonment claimants must follow a two-step process." *Griffith v. Cleveland*, 128 Ohio St.3d 35, 2010-Ohio-4905, paragraph two of the syllabus. In the first step, the claimant must obtain a preliminary factual determination from a court of common pleas that he or she is a wrongfully imprisoned individual as defined by R.C. 2743.48(A). *See id.* Claimants who have obtained this determination may then pursue an action for damages in the Court of Claims as provided by R.C. 2743.48(D). *See id.*

**{¶7}** R.C. 2743.48(A) requires an individual seeking compensation for wrongful imprisonment to demonstrate that:

(1) The individual was charged with a violation of a section of the Revised Code by an indictment or information, and the violation charged was an aggravated felony or felony.

(2) The individual was found guilty of, but did not plead guilty to, the particular charge or a lesser-included offense by the court or jury involved, and the offense of which the individual was found guilty was an aggravated felony or felony.

(3) The individual was sentenced to an indefinite or definite term of imprisonment in a state correctional institution for the offense of which the individual was found guilty.

(4) The individual's conviction was vacated, dismissed, or reversed on appeal, the prosecuting attorney in the case cannot or will not seek any further appeal of right or upon leave of court, and no criminal proceeding is pending, can be brought, or will be brought by any prosecuting attorney, city director of law, village solicitor, or other chief legal officer of a municipal corporation against the individual for any act associated with that conviction[,] [and]

(5) Subsequent to sentencing and during or subsequent to imprisonment, an error in procedure resulted in the individual's release, or it was determined by the court of common pleas in the county where the underlying criminal action was initiated that the charged offense, including all lesser-included offenses, either was not committed by the individual or was not committed by any person.

R.C. 2743.48(A) places the burden on the claimant to prove by a preponderance of the evidence that he or she satisfies each of the requirements set forth therein. *Doss v. State*, 135 Ohio St.3d 211, 2012-Ohio-5678, paragraph one of the syllabus. In this case, the parties stipulated that J.D. and M.M. satisfied the requirements of R.C. 2743.48(A)(1)-(3), and the case went to trial on the issue of whether they satisfied R.C. 2743.48(A)(4) and (5). The trial court, in turn, decided this matter based on its determination that J.D. and M.M. had not proved that they satisfied R.C. 2743.48(A)(5), so our analysis is confined to that section as well. Specifically, our consideration is whether J.D. and M.M. established "that the charged offense, including all lesser-included offenses, either was not committed by [them] or was not committed by any person." R.C. 2743.48(A)(5).

{¶8} This element of R.C. 2743.48 requires a claimant to prove that he or she is actually innocent of the charges at issue. *See Doss* at ¶ 12; *Palmer*, 1999 WL 820758, at *2. "[A] verdict or judgment of acquittal in a criminal trial is a determination that the state has not met its burden of proof on the essential elements of the crime. It is not necessarily a finding that the accused is innocent." *Walden v. State*, 47 Ohio St.3d 47, 51 (1989). Consequently, a judgment of acquittal subsequent to conviction is not the same as a determination of actual innocence under R.C. 2743.48(A)(5). *See id.* at paragraph two of the syllabus. "When a court vacates or reverses a criminal conviction based on insufficiency of the evidence, the court is saying that the state has not proven the elements of the offense beyond a reasonable doubt; it is not saying that innocence has been proven. Thus, reversal on insufficiency of the evidence does not automatically mean that the defendant was wrongfully imprisoned." *Doss* at ¶ 15, citing *Chandler v. State*, 95 Ohio App.3d 142, 149 (8th Dist.1994).

{¶9} J.D. and M.M. were charged with illegal manufacture of drugs in violation of R.C. 2925.04(A), which provides that "[n]o person shall knowingly * * * manufacture or otherwise engage in any part of the production of a controlled substance." They were also charged with illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A), which provides that "[n]o person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code."

{¶10} C.P., an acquaintance of J.D. and M.M. who was staying at the house next door to the scene of the incident in October 2012, testified on their behalf. She testified that during the evening of October 27, 2012, she and her then-boyfriend contacted J.D. to obtain a ride to her boyfriend's home. Although she initially testified that she and her boyfriend contacted J.D., she ultimately clarified that her boyfriend sent text messages to J.D. and that she did not see either his messages or J.D.'s responses. C.P. testified that she believed her boyfriend sent two text messages several hours apart and that after a couple of hours, he said J.D. would be there shortly to pick them up. Instead of waiting for J.D., however, C.P. and her boyfriend fell asleep in an upstairs bedroom. According to C.P., they never saw J.D. and M.M. at the house where she was staying, but she testified that she believed that the only reason J.D. was in the area was to give her and her boyfriend a ride. C.P. hypothesized that J.D. and M.M. must have gone to the house next door because they could not contact her, but she acknowledged that she never communicated directly with J.D. and M.M. on the night in question. She testified that when she saw J.D. and M.M., they were in police cruisers parked in front of the house next door.

{¶11} D.C. lived next door to C.P. in the house where the events in question took place. He testified that J.D. and M.M. were at his house to pick up his cousin, who was also C.P.'s boyfriend, but according to his version of events, it was he who contacted J.D. to give the couple a ride. He acknowledged that when the police came to his house, he was in the living room with J.D., M.M., and two other individuals. C.P. denied that J.D. and M.M. provided him with any of the materials necessary to manufacture methamphetamine and, specifically, that they provided any components to him in exchange for cash or drugs. He acknowledged that he had been known to manufacture methamphetamine, but said that he did so outdoors, at "a little spot where I go where nobody can be affected." When shown a picture of a garbage bag that was purported to contain byproducts of manufacturing methamphetamine, D.C. denied that he knew what the substance was, and he hypothesized that if garbage bags containing methamphetamine trash were found in the house, it was because the police planted them there. D.C. admitted that he had manufactured methamphetamine during the week leading up to October 28, 2012, but denied that he had done so on that day or within the three days prior.

{¶12} J.D. testified that she arrived with M.M. at the scene of the events in question because C.P.'s boyfriend sent her text messages asking for a ride. She claimed that he asked her to pick him up next door rather than at the house where C.P. had been staying, but that he was not present when they arrived. J.D. testified that she did not go to the house for any other reason and, specifically, that she did not go there to provide any of the components needed to manufacture methamphetamine or to trade those components for methamphetamine. She testified that she had never removed methamphetamine trash from the house and that she did not do so on the evening of October 28th. J.D. denied that she brought any drug paraphernalia with her: specifically, she denied that either an Altoids case containing drug paraphernalia or a vial of

methamphetamine was hers and she denied that she owned a digital scale found in the living room. She also denied that she had used methamphetamine while there.

{¶13} M.M.'s testimony was similar. He stated that he and J.D. were present in order to give C.P. and her boyfriend a ride home. He denied that he provided any product for the manufacture of methamphetamine and that he removed any trash containing byproducts from the manufacture of methamphetamine from D.C.'s house. M.M. acknowledged his prior conviction for manufacturing methamphetamine and that he was on probation at the time of the events in question, and he admitted that during a recorded telephone call from jail, he stated that he "knew [he] probably shouldn't have gone over there." He testified that he was familiar with the distinctive odor of methamphetamine production, but denied that the odor was present that night. M.M. denied that there had been four lines of methamphetamine on the coffee table when he was sitting in the living room. He testified that he did not see pliers, a pipe cutter, electrical tape, alcohol, chemical gloves, baggies with residue, a digital scale, a pink pouch containing straws, or an Altoids container holding razors, aluminum foil, and a vial of methamphetamine in the living room.

{¶14} The State's two witnesses painted a different picture of the events on October 28, 2012. Officer David Crockett, a member of the Akron Police Department's clandestine laboratory enforcement team, testified that he had received multiple complaints about methamphetamine manufacture at D.C.'s residence. He explained that at approximately 10:30 p.m. on October 27, 2012, he was asked to provide assistance to two officers conducting a traffic stop near the same neighborhood because the subjects of the stop were carrying methamphetamine and had receipts showing the recent purchase of items used in methamphetamine production. Those individuals proved to be D.C.'s next door neighbors and,

during a search of their residence, Officer Crockett found Coleman stove fuel, muriatic acid, and acid generators, which he identified as items used in methamphetamine production. He also learned that the occupants of D.C.'s house may be cooking methamphetamine that night. Officer Crockett also explained that C.P. and her boyfriend were present at the house that was searched.

{¶15} Officer Crocket testified that he had other reasons to suspect that methamphetamine was being manufactured at D.C.'s house that evening: He had previously found "meth dumpsite[s]" within a block or two of the residence containing "the trash or waste that's left over from manufacturing meth such as bottles, acid gas generators, the trash from the packaging and from the materials." He also noted that the windows in the house were open and that fans were operating, and he could see two men outside. Officer Crockett testified that when he approached, one man threw a gun away, and he determined that the scene presented "a very volatile situation."

{¶16} Officer Crockett recalled that when he entered the house, he immediately noted the distinct chemical odor associated with methamphetamine production, which indicated to him that it was presently occurring or had occurred very recently. J.D. and M.M. were in the living room, which—as depicted by pictures introduced during the hearing—was strewn with items related to methamphetamine manufacture. He noted drug residue on the living room table and stereo speakers. Officer Crockett testified that he heard running water in the house, and the immediacy of the probable manufacture of methamphetamine led him to be concerned that the scene posed a risk of explosion or fire. In addition to the items in the living room, Officer Crockett found products related to manufacturing methamphetamine throughout the house. He explained that he located D.C. in the basement of the home, where he also found pseudoephedrine and several other chemicals and products used in manufacturing

methamphetamine. Officer Crocket also discovered a trash bag containing sludge byproduct that was "still very wet * * * [not] dried out at all" and appeared to have been disposed of "very recently, within a few days[.]" With respect to the sludge generated during methamphetamine manufacture, Officer Crockett explained that it contains many dangerous elements and, consequently, cooks usually dispose of it quickly. He noted that it is "very rare" for cooks to leave sludge lying around for days.

{¶17} Officer Crocket also testified that it is rare for individuals to manufacture methamphetamine alone. Instead, he explained, cooks prefer not to draw attention to themselves by procuring all of the materials on their own, so other individuals often purchase materials such as batteries, ammonium nitrate, and Sudafed and trade them to the cook in exchange for money or drugs—a practice known as "smurfing."

{¶18} The State's other witness, a woman named A.H., testified that she was living at D.C.'s house at the time and had been convicted of a criminal charge arising from the events of October 28th. She explained that during the investigation of the underlying incident, she agreed to provide a truthful account of the events to Officer Crockett. As part of her proffer, she informed Officer Crockett that she was "completely involved" in the incident, both providing chemicals for manufacturing methamphetamine and using herself.

{¶19} A.H. explained that J.D., M.M., and several other individuals were present at D.C.'s house in order "[t]o get high." She testified that C.P.'s boyfriend had requested a ride that evening, but not until after J.D. and M.M. had arrived. She explained that D.C. laid four lines of methamphetamine out on a stereo speaker, but that M.M. blew them away when the police came. A.H. testified that she was certain that J.D. brought the pink pouch containing straws and other

paraphernalia, noting that "[s]he had it on her all the time." She also testified that the Altoids container and the digital scale found in the living room belonged to J.D.

{¶20} A.H. testified that she was certain that she had seen J.D. and M.M. bring supplies for D.C. to cook methamphetamine within a week before October 28th. Specifically, she explained that they provided "[c]old packs, lye, Coleman [fuel], [and] Sudafed." A.H. also testified that J.D. and M.M. had removed waste from cooking after she placed it in garbage bags. A.H. estimated that D.C. had last cooked methamphetamine one or two nights before October 28th. She acknowledged that she had previously cooperated with the investigation of the underlying incident and that some of her current testimony was more detailed than her proffer. A.H. also stated, however, that she was not willingly testifying in these proceedings.

{¶21} J.D. and M.M. maintain that the trial court's judgment that they did not prove that they were actually innocent of the crimes with which they were charged is against the manifest weight of the evidence because A.H.'s testimony should be viewed with suspicion and, in their estimation, there is no evidence supporting the State's theory of the case. The burden of proof in this case, however, did not fall to the State. J.D. and M.M. bore the burden of proving that they were actually innocent of the charges by a preponderance of the evidence. *See Doss*, 135 Ohio St.3d 211, 2012-Ohio-5678, at ¶ 12.

{¶22} This Court must "'consider[] the credibility of witnesses'" as part of our manifest weight review. *State v. Thompkins*, 78 Ohio St.3d 380, 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Nonetheless, this Court is mindful of the well-established principle that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. Rivera*, 9th Dist. Lorain No. 18CA011263, 2019-Ohio-62, ¶ 39, quoting *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. In this case, the trial court not only found the

testimony of A.H. to be credible, but the testimony of Officer Crockett as well.  In that respect, this Court notes that Officer Crockett's testimony is supported by the photographic evidence introduced at trial, which stands in stark contradiction to D.C.'s testimony.  Given all of the evidence in this case, we cannot conclude that this is the exceptional case in which the evidence weighs heavily against the trial court's judgment.

{¶23}  J.D. and M.M.'s assignment of error is overruled.

III.

{¶24}  J.D. and M.M.'s assignment of error is overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
SCHAFER, J.
CONCUR.


APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellants.

DAVE YOST, Attorney General, and THOMAS MADDEN, Assistant Attorney General, for Appellee.